UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

LYENESHA REMBERT,

                              Plaintiff,

                                                    **REPORT AND**
                                                    **RECOMMENDATION**

              v.                                    13-CV-638A

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

                              Defendant.

## I.      INTRODUCTION

      The Hon. Richard J. Arcara referred this case to this Court under 28 U.S.C.

§ 636(b).  Pending before the Court are cross-motions for judgment on the

pleadings by plaintiff Lyenesha Rembert ("Rembert") (Dkt. No. 16) and the

Commissioner of Social Security ("Commissioner") (Dkt. No. 11).  Rembert

argues that the Commissioner did not explain why an evaluation establishing

marked limitations in functioning received little weight while other evaluations

received more weight.  Rembert argues further that the evaluations that received

greater weight did not rest on a fully developed record.  Additionally, Rembert

argues that the administrative record contains no opinions from treating

physicians regarding her mental abilities and limitations.  Finally, Rembert asserts

that the Commissioner never conducted an assessment of the criteria for

intellectual disability and never made a specific credibility finding about the totality

of her testimony and allegations.  The Commissioner responds that Rembert did

not meet her burden of satisfying all of the criteria for the intellectual disability

listing; that the record contains numerous contradictions in plaintiff's testimony

and assertions so as to undermine her credibility; and that substantial evidence

supports the conclusion that Rembert is capable of performing unskilled work that

is task-oriented and routine in nature.

The Court has deemed the motion submitted on papers under Rule 78(b)

of the Federal Rules of Civil Procedure.  For the reasons below, the Court

respectfully recommends granting Rembert's motion in part, vacating the

Commissioner's determination, and remanding the case for an assessment of

intellectual disability.  The Court recommends denying Rembert's motion without

prejudice to the extent that it seeks any other relief.  The Court further

recommends denying the Commissioner's motion.

## II.    BACKGROUND

### A.    *Procedural History*

Rembert applied for Supplemental Security Income ("SSI") on September

8, 2010, claiming a disability that began on October 29, 1996.  (Certified

Administrative Record at 136, hereinafter designated as [136].)  Given that

Rembert was born in late 1987, her disability would have begun when she was

eight years old.  Rembert had applied for SSI once before but received a denial

on June 26, 2009.  [80.]  On the second request, Rembert received a denial on

December 30, 2010.  [84.]  Rembert then requested a hearing on January 24,

2011.  [88.]  The hearing occurred on February 10, 2012 before Administrative

Law Judge ("ALJ") Marilyn Zahm.  The ALJ subsequently issued a decision on

March 6, 2012 denying Rembert's claim.  [19.]  After seeking an administrative

appeal to the Appeals Council, the Appeals Council upheld the denial of benefits

on April 25, 2013.  [1.]  This case followed when Rembert filed a complaint on

June 18, 2013.  (Dkt. No. 1.)

### B.   *Factual and Medical Background*

The administrative record includes behavioral assessments from the

Buffalo Public Schools.  The assessments occurred after Rembert threatened a

teacher.  Behaviors targeted for review included insubordination, aggressive

verbalization and body language, and disrespect toward school rules and

authority figures.  [187.]  Reviewers noted concern that Rembert would hit and

argue with peers and that her behavior would escalate.  [191.]  The reviews

included recommendations to transfer Rembert from a 15:1 to a 6:1:1 classroom

setting.  [196.]  One record described Rembert's "escalating behavior concerns"

and "oppositional-defiant" behavior that led to "trouble in the community."  [224.]

Nonetheless, at least one school psychologist maintained "a high level of

confidence in [Rembert's] ability to mature into more appropriate and adaptive

behavior.  [198.]  Also, one record from January 2004 stated that Rembert's

mother considered her healthy and was pleased with the educational plan that existed at that time.  [233.]  A follow-up evaluation from February 2004 contains Stanford-Binet Fourth Edition ("SB:FE") composite scores of 92 from 1995; 77 from 1997; and 79 from 1999.  [319.]  The evaluation also contains a Wechsler Adult Intelligence Scale, third edition ("WAIS-III") result, an unspecified score of "Borderline."[1]  [319.]

Rembert's school records assessed her in other ways as well.  According to the records, Rembert was in the very low range of reading, mathematics, and written language skills, but was able to "calculate basic facts" and to solve basic word problems.  [202.]  Some of Rembert's behavior may have stemmed from "a strong sense of fairness and what is right" that could lead to counterproductive actions and that needed a structured setting.  [202.]  The records note a history of migraine headaches, an automobile accident from July 2001, and a history of lead poisoning.  [203.]

On February 25, 2009, psychologist Dr. Renee Baskin ("Baskin") evaluated Rembert.  Baskin noted that Rembert reported never being employed, having no history of hospitalization for medical reasons, and having no current medications. 240.  Rembert reported symptoms of depression including thoughts of death or

---

[1] The Court takes judicial notice that a WAIS-III category of "borderline" covers a range of test scores between 70 and 79.  *See, e.g.*, William E. Benet, *IQ Classifications in Educational Use*, Assessment Psychology Online (Feb. 25, 2014), http://www.assessmentpsychology.com/iqclassifications.htm (last visited Mar. 11, 2014).

suicide but without any current plan or intent.  [240.]  Rembert reported no drug

and alcohol history.  Baskin found Rembert minimally responsive to questions

along with restricted affect.  [241.]  Baskin found that Rembert's attention,

concentration, and memory were "mildly impaired due to some discomfort,

anxiety and nervousness in the evaluation as well as a lack of effort."  [242.]

Baskin estimated Rembert's intellectual functioning to be deficient.  [242.]

Regarding vocational functional capacities, Baskin concluded that Rembert

"would have minimal to no limitations being able to follow and understand simple

directions and instructions, perform simple tasks independently; moderate

limitations being able to maintain attention and concentration, learn new tasks,

perform complex tasks, make appropriate decisions, relate adequately with

others and appropriately deal with stress."  [242.]  Administration of the WISC-III

test yielded a verbal scale IQ of 66, a performance scale IQ of 57, and a full scale

IQ of 59.  According to Baskin, "All scaled scores cluster in the deficient range

suggesting difficulties with both verbal and nonverbal problem solving skills.

While it appears the claimant does have some cognitive limitations, her true

cognitive abilities are probably better represented by her verbal scale IQ which

still is in the deficient range."  [246.]  Baskin ultimately diagnosed major

depressive disorder on Axis I and mild mental retardation on Axis II.  [243.]

Baskin further concluded that Rembert could not manage her own funds due to

her cognitive limitations but that she could consider vocational training if she stabilized and engaged in therapy.  [243, 246.]

Physician Nikita Dave, M.D. examined Rembert on March 2, 2009.  Among other findings, Rembert reported no alcohol or drug use.  [249.]  Dr. Dave ultimately diagnosed auditory hallucinations, emotional disturbances, and a learning disability, all of which could use further testing and workup.  [251.] Subject to further assessment of learning disabilities, Dr. Dave concluded that Rembert had no medical limitations.  [251.]

Psychiatrist Hillary Tzetzo, M.D. ("Tzetzo") examined Rembert on June 25, 2009.  In summary, Dr. Tzetzo decided that Rembert needed an assessment of residual functional capacity ("RFC").  [252.]  Tzetzo based her disposition on an assessment of Listings 12.02 (Organic Mental Disorders), 12.04 (Affective Disorders), and 12.09 (Substance Addiction Disorders).  [252.]  The psychiatric review did not cover Listing 12.05 (Mental Retardation),[2] among other categories. For the categories evaluated, Tzetzo found mild restriction in activities of daily living; and moderate limitations in social functioning and maintaining concentration.  [262.]  In her notes, Tzetzo noted the SB:FE composite IQ scores of 92 in 1997 and 79 in 1999.  [264.]  Tzetzo reviewed several prior examinations from 2008 and 2009, including a July 28, 2008 emergency room visit following an

_____

[2] "Mental Retardation" was the older designation for the listing now called "Intellectual Disability."

overdose; among other findings, Tzetzo noted that Rembert gave different
information at different times about her daily marijuana use and that her "overall
credibility seems suspect, in my opinion, now."  [264.]  Tzetzo also questioned
whether Rembert and her mother overexaggerated Rembert's limitations and
prior examinations, given "all other available medical evidence" and a lack of
verification of childhood lead poisoning.  [264.]  Tzetzo concluded that Rembert
"should be able to understand and follow work directions in a work setting (with
low public contact), maintain attention for such work tasks, relate adequately to a
work supervisor for such work tasks, and use judgment to make work-related
decisions in a work setting (with low public contact) now, in my opinion."  [264.]

Rembert experienced a hospitalization when she entered Buffalo General
Hospital on September 27, 2009.  Rembert presented with a complaint about her
mood and its fluctuations, including angry attacks on others.  [298.]  Rembert also
reported suicidal thoughts but without any plan or lethality.  [300.]  Rembert
reported a history of marijuana use with a last use of one year earlier.  [303.]
Doctors found no physical ailments but diagnosed depression not otherwise
specified; bipolar disorder; borderline intellectual functioning; and a Global
Assessment of Functioning ("GAF") score of 40–45.  [306.]

Baskin evaluated Rembert again on October 6, 2010.  Rembert again
reported no alcohol abuse or drug abuse.  [308.]  Rembert did report an arrest for
stealing a car but claimed that the matter was resolved.  [308.]  Baskin noted poor

social skills and evasive answers along with poor grooming.  Although Rembert

had been diagnosed in 2009 as having 20/30 uncorrected vision [249] Baskin

wrote that Rembert "is supposed to wear glasses but does not."  [308.]  Baskin

further noted mild impairment of attention and concentration due to anxiety or

nervousness in the evaluation.  [309.]  Baskin also found borderline intellectual

functioning and diagnosed generalized anxiety disorder and personality disorder

not otherwise specified.  [310.]  Baskin concluded that Rembert "would have

minimal to no limitations being able to follow and understand simple directions

and instructions and perform simple tasks independently.  She would have

moderate limitations being able to maintain attention and concentration, maintain

a regular schedule, learn new tasks with supervision.  She would have marked

limitations being able to make appropriate job-related decisions, relate

adequately with others and appropriately deal with stress."  [310.]

Rembert treated briefly in Fall 2009 with Horizon Corporation but was

terminated from therapy sessions on November 19, 2009.  [271.]  Horizon cited

Rembert's failure to attend three appointments as a basis for termination.  [271.]

The administrative record includes an emergency room visit to Buffalo

General Hospital on March 19, 2010.  According to the emergency room notes,

Rembert had a verbal fight with her sister that day that led to a call to police.

[288.]  Rembert allegedly told police officers that she would kill herself before

hurting anyone else.  Police officers brought Rembert to the hospital, where she

told medical staff that she did not want to hurt herself or anyone.  [288.]  Doctors found no acute medical problems but did diagnose an adjustment reaction that warranted follow-up at Horizon.  [289.]  The doctors found low to no risk for self-harm.  [292.]  Other records from the hospital visit show a more specific diagnosis of adjustment disorder and personality disorder, with a GAF score of 55.  [296.] The records also included a mention of Rembert's "anger problem" and her tendency to engage in physical altercations and to use marijuana to control her anger.  [293.]  Rembert had used marijuana as recently as the day before.  [293.]

On October 29, 2010, Rembert saw nurse practitioner Gerald Turk ("Turk") for an initial psychiatric evaluation.  Compared to other evaluations, this evaluation added Rembert's acknowledgment that she has "an extensive history of violence" that includes police intervention "after she has engaged in property destruction."  [327.]  Turk's evaluation also expands on potential issues with amenorrhea and hormonal imbalances that some of the Buffalo General Hospital records mentioned only in passing.  [328.]  Turk ultimately diagnosed Rembert with a continuous marijuana dependence, posttraumatic stress disorder pertaining to childhood trauma, panic disorder with agoraphobia, and a current GAF score of 45 that declined from 50 the previous year.  [329.]

On December 20, 2010, Rembert went to Erie County Medical Center after taking 30 Klonopin pills in an attempted overdose.  Rembert reported a history of suicide attempts but denied a suicide attempt on this occasion.  [506.]  The

examiner noted poor intellectual functioning, insight, and judgment.  [506.]  The examiner diagnosed Rembert with impulse control disorder, bipolar disorder, borderline personality disorder, and mental retardation; the examiner also assigned a GAF score of 61–70.  [507.]  The examiner noted further that Rembert's "limited cognitive abilities would make her susceptible to accidental [overdose]" but that "she does not present as a danger to herself at this time [and] does not meet the criteria for acute inpatient psychiatric [treatment] and she is safe for [discharge]."  [508.]

On December 30, 2010, psychologist T. Andrews ("Andrews") performed a psychiatric review for Listings 12.06 and 12.08.  Andrews did not perform a review for Listing 12.05.  After reviewing prior medical and psychological records, Andrews concluded that an RFC assessment was necessary.  Andrews concluded also that Rembert was not significantly limited in the following areas: ability to remember locations and work-like procedures; ability to understand and remember very short and simple instructions; ability to carry out very short and simple instructions; ability to sustain an ordinary routine without special supervision; ability to work in coordination with more proximity to others without being distracted by them; ability to make simple work-related decisions; ability to ask simple questions or request assistance; ability to respond appropriately to changes in the work setting; ability to be aware of normal hazards and take appropriate precautions; and ability to set realistic goals or make plans

independently of others.  [370–371.]  Andrews found moderate limitations in the

following areas: ability to understand and remember detailed instructions; ability

to carry out detailed instructions; ability to maintain attention and concentration

for extended periods; ability to perform activities within a schedule, maintain

regular attendance, and be punctual within customary tolerances; ability to

complete a normal workday and work week without interruptions from

psychologically-based symptoms and to perform at a consistent pace without an

unreasonable number and length of rest periods; ability to interact appropriately

with the general public; ability to accept instructions and respond appropriately to

criticism from supervisors; ability to get along with coworkers or peers without

distracting them or exhibiting behavioral extremes; ability to maintain socially

appropriate behavior and to adhere to basic standards of neatness and

cleanliness; and ability to travel in unfamiliar places or use public transportation.

[370–371.]  Andrews found no marked limitations.

Rembert's disability hearing occurred on February 10, 2012 before ALJ

Zahm.  Rembert testified that she was 24 years old, stood 5' 8" tall, and weighed

235 pounds, an increase from 198 pounds the year before.  [47.]  Rembert does

not own or drive a car but has a permit.  [47.]  As for a residence, Rembert splits

time between a friend's house and her mother's house; she avoids her mother's

house when her sister is there.  [68–69.]  Tenth grade was the highest level of

education completed.  [48.]  Rembert last worked for a few months stocking

shelves at Kmart, but was fired after an altercation with a manager.  [49.]  As for household activities, Rembert watches television from the afternoon to about 2:00 p.m. and then sleeps through the morning.  [50–51.]  Rembert does not cook beyond warming meals in a microwave, does not wash dishes or laundry, and does not vacuum or mop, though she does sweep.  [51–52.]  Rembert smokes about half a pack of cigarettes daily, and used marijuana when she was stressed going back to approximately age 15.  [53–54.]  Rembert testified that she stopped using marijuana to avoid interference with some of her medication.  [54.] Rembert reported having no physical ailments.  [55.]  The central disability that Rembert claimed related to reading comprehension and anger or mood management.  [*See* 56–58.]  Rembert's medications include clonazepam, amitriptyline, and formerly Lexapro and Klonopin.  [*See* 58–63.]  With respect to school history, Rembert testified about behavioral incidents that she experienced pertaining to anger management.  [64–65.]  The anger management problem manifests itself now as aggravation if she spends more than approximately 15 minutes in a crowd, for example at a grocery store.  [66.]

Vocational Expert ("VE") Timothy Janikowski also testified at the hearing. The ALJ asked the VE the following hypothetical question: "For purpose of this hypothetical please assume someone the claimant's age, educational level, no past work experience, with the following limitations: reading at the 2.7 grade level, able to perform math calculations at the 5.2 grade level, no interaction with public,

occasional interaction with co-workers, and simple, routine work.  Is there any

work in the economy for this RFC?"  [73.]  The VE responded that unskilled work

would be available, though it would have to be grounded in concrete tasks and

routine in nature.  [73.]  The VE provided the examples of a machine packager,

and industrial cleaner, and a production assembler.  [74.]  Jobs such as the

examples provided would be "primarily things oriented," would allow

approximately a 10-15% variation in work pace, would allow an average of one

absence per month, and would require some communication with other workers

but not as a coordinated team member.  [75.]  These types of jobs usually have

limited training and are learned within about 30 days through demonstration.

[76.]  Jobs such as the examples provided do not proceed at a fast pace but do

require a worker to stay on task and to produce a certain amount of work within a

given period of time.  [77.]  The hearing ended after the VE's testimony.

## III.  DISCUSSION

### A.    *Standard of Review Generally*

The only issue to be determined by this Court is whether the ALJ's decision

that Rembert was not under a disability is supported by substantial evidence. *See*

42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir.1991).

Substantial evidence is defined as "'more than a mere scintilla.  It means such

relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

For purposes of both Social Security Insurance and disability insurance benefits, a person is disabled when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A).

Such a disability will be found to exist only if an individual's "physical or mental impairment or impairments are of such severity that [he or she] is not only unable to do [his or her] previous work but cannot, considering [his or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. §§ 423(d) (2)(A) & 1382c(a)(3)(B).

Rembert bears the initial burden of showing that her impairment prevents her from returning to her previous type of employment. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir.1982). Once this burden has been met, "the burden shifts to the [Commissioner] to prove the existence of alternative substantial gainful work which exists in the national economy and which the plaintiff could perform." *Id.*; *see also Dumas v. Schweiker*, 712 F.2d 1545, 1551 (2d Cir.1983); *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir.1980).

14

To determine whether any plaintiff is suffering from a disability, the ALJ must employ a five-step inquiry:

(1) whether the plaintiff is currently working;

(2) whether the plaintiff suffers from a severe impairment;

(3) whether the impairment is listed in Appendix 1 of the relevant regulations;

(4) whether the impairment prevents the plaintiff from continuing her past relevant work; and

(5) whether the impairment prevents the plaintiff from continuing her past relevant work; and whether the impairment prevents the plaintiff from doing any kind of work.

20 C.F.R. §§ 404.1520 & 416.920; *Berry*, *supra*, 675 F.2d at 467. If a plaintiff is found to be either disabled or not disabled at any step in this sequential inquiry, the ALJ's review ends. 20 C.F.R. §§ 404.1520(a) & 416.920(a); *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir.1992). However, the ALJ has an affirmative duty to develop the record. *Gold v. Secretary*, 463 F.2d 38, 43 (2d Cir.1972).

To determine whether an admitted impairment prevents a plaintiff from performing her past work, the ALJ is required to review the plaintiff's residual functional capacity and the physical and mental demands of the work she has done in the past. 20 C.F.R. §§ 404.1520(e) & 416.920(e). The ALJ must then

determine the individual's ability to return to her past relevant work given her residual functional capacity.  *Washington v. Shalala*, 37 F.3d 1437, 1442 (10th Cir.1994).

### B.    *Steps One and Two*

The first two steps of the five-step inquiry do not require much discussion. Both sides seem to agree that Rembert has not engaged in substantial gainful activity since the application date of September 8, 2010.  As for the second step, the ALJ found several impairments, including IQ and mood disorders, that individually or together qualify as severe impairments under 20 CFR 404.1520(c) and 416.920(c).  Although Rembert has several arguments about later steps, both she and the Commissioner make no arguments at this step.  Consequently, the Court finds that substantial evidence supports the ALJ's findings for the first two steps.

### C.    *Step Three and Listing 12.05*

Rembert and the Commissioner begin to diverge at the third step, but a procedural gap in the ALJ's analysis at this stage draws the Court's immediate attention.  When Rembert applied for benefits, she asserted mental disability as a basis for an award.  [*See* 87 ("You said you were disabled because of learning disability, mental disability.").]  Of the various ailments listed in 20 C.F.R. Pt. 404, Subpt. P, App'x 1, Listing 12.00 carries the matching title of "Mental Disorders." Many of the sections within this listing pertain to mood, anxiety, personality, and

16

substance-abuse disorders; since Rembert's application and records contain

extensive information about those types of disorders, Tzetzo and Andrews

reasonably focused their psychiatric reviews on Listings 12.02 (Organic Mental

Disorders), 12.04 (Affective Disorders), 12.06 (Anxiety-Related Disorders), 12.08

(Personality Disorders), and 12.09 (Substance Addiction Disorders).  [*See* 252,

356.]

     What puzzles the Court, though, is that the one listing that most closely

matches Rembert's claim of mental disability—Listing 12.05, titled "Intellectual

Disability"—conspicuously is missing from any psychiatric review sent to the

Commissioner.  Listing 12.05 defines "intellectual disability" as "significantly

subaverage general intellectual functioning with deficits in adaptive functioning

initially manifested during the developmental period; i.e., the evidence

demonstrates or supports onset of the impairment before age 22."  [256, 360.]

The listing then establishes that a claimant can meet the required level of severity

if she establishes any one of four criteria balancing intellectual functioning against

other limitations.  Section A would require "dependence upon others for personal

needs (e.g., toileting, eating, dressing, or bathing) and inability to follow

directions, such that the use of standardized measures of intellectual functioning

is precluded."  [*Id.*]  Rembert arguably does not meet that criterion; while the

record indicates limited household activities, it also indicates an ability to maintain

basic grooming and to follow simple directions for employment purposes and for

an IQ test.  The next two criteria, however, have enough of a directly facial

confirmation in the record that they should have prompted further inquiry.  Section

B requires "[a] valid verbal, performance, or full scale IQ of 59 or less" with no

other conditions attached.  [*Id.*]  "Valid" means that "the test measures what it is

supposed to measure."  Listing 12.00(D)(5)(c).  On February 25, 2009, just a little

over a year before the application date of September 8, 2010, Baskin performed

WAIS-III IQ testing and found a verbal scale IQ of 66, a performance scale IQ of

57, and a full scale IQ of 59.  Appendix I lists the WAIS-III as a test calibrated with

the criteria of Listing 12.05, meaning that it has "a mean of 100 and a standard

deviation of 15."  Listing 12.00(D)(6)(c).  Additionally, "[i]n cases where more than

one IQ is customarily derived from the test administered, e.g., where verbal,

performance, and full scale IQs are provided in the Wechsler series, we use the

lowest of these in conjunction with 12.05."  *Id.*  Finally, the 2009 scores can be

considered current since Rembert was older than 16 years of age when she

underwent the testing.  *See* Listing 112.00(D)(10) ("Generally, the results of IQ

tests tend to stabilize by the age of 16.  Therefore, IQ test results obtained at age

16 or older should be viewed as a valid indication of the child's current status,

provided they are compatible with the child's current behavior.").  The 2009

testing session, therefore, yielded two scores that, on their faces, explicitly

satisfied Section B.  Baskin commented in her reports that the verbal score better

reflected Rembert's abilities, but she made that conclusion in a single sentence

18

without any explanation as to what happened in the testing session that made the

verbal score valid but not the other two.  Even if the ALJ wanted to credit Baskin's

leaning toward the verbal score, Section C requires only a "valid verbal,

performance, or full scale IQ of 60 through 70 and a physical or other mental

impairment imposing an additional and significant work-related limitation of

function."  Andrews found moderate limitations in the following areas: ability to

understand and remember detailed instructions; ability to carry out detailed

instructions; ability to maintain attention and concentration for extended periods;

ability to perform activities within a schedule, maintain regular attendance, and be

punctual within customary tolerances; ability to complete a normal workday and

workweek without interruptions from psychologically-based symptoms and to

perform at a consistent pace without an unreasonable number and length of rest

periods; ability to interact appropriately with the general public; ability to accept

instructions and respond appropriately to criticism from supervisors; ability to get

along with coworkers or peers without distracting them or exhibiting behavioral

extremes; ability to maintain socially appropriate behavior and to adhere to basic

standards of neatness and cleanliness; and ability to travel in unfamiliar places or

use public transportation.  [370-371.]  *Cf. Fuimo v. Colvin*, 948 F. Supp. 2d 260,

267 (N.D.N.Y. 2013) (finding satisfaction of Listing 12.05(C) where, *inter alia*, the

claimant needed an escort for shopping trips, had limited leisure-time activities,

and had deficits in adaptive functioning).  Again, the record at the least seems to

19

match Sections B and C enough to warrant further inquiry under Listing 12.05. During the further inquiry, the Commissioner should take care to address any evidence in the record concerning adaptive functioning. *Cf. Barton v. Astrue*, No. 3:08–CV–0810 (FJS/VEB), 2009 WL 5067526, at *7 (N.D.N.Y. Dec. 16, 2009) (remanding where the ALJ assessed only a few areas of adaptive functioning).

Any argument from the Commissioner that the ALJ effectively reviewed the standards for Listing 12.05 are not persuasive under the circumstances here.  In her decision, the ALJ's entire analysis for step three rests on Listings 12.02, 12.06, and 12.08, and their respective criteria.  None of the analysis for those listings addresses what to do about Rembert's most recent IQ scores and about the findings of mild and moderate limitations.  *Cf. Backus v. Astrue*, No. 3:05–CV–1180 (NAM), 2008 WL 4519006, at *12 (N.D.N.Y. Sept. 29, 2008) (citing "the failure of the ALJ to produce any discussion on Listing 12.05(C)" among reasons warranting a remand to the Commissioner).  Neither does the ALJ's analysis in step four compensate.  In her step four analysis, the ALJ does address Rembert's IQ scores from her school years and from February 25, 2009. The ALJ dismisses the 2009 IQ scores categorically in favor of the school-age IQ scores, giving credence to Baskin's notation that Rembert gave a poor effort. The ALJ had discretion to endorse Baskin's findings as credible with an appropriate explanation.  *See* Listing 12.00(D)(5)(c) ("In considering the validity of a test result, we should note and resolve any discrepancies between formal test

20

results and the individual's customary behavior and daily activities."). Baskin,

however, endorsed at least the verbal score of 66. Baskin never acknowledged

the school-age records; Tzetzo and Andrews merely noted them. Among other

possible problems, three of the four IQ scores in the school records came from

the SB:FE test, which has a mean score of 100 but a standard deviation of 16.

*See, e.g.*, Eric A. Youngstrom et al., *Stanford-Binet Intelligence Scale: Fourth

Edition (SB4): Evaluating the Empirical Bases for Interpretations, in* Handbook of

Psychological and Educational Assessment: Intelligence, Aptitude, and

Achievement 217, 222 (C.R. Reynolds & R.W. Kamphaus, eds., 2nd ed., 2003).

That standard deviation differs from the standard deviation of 15 for the WAIS-III,

meaning that "IQs obtained from standardized tests that deviate from a mean of

100 and a standard deviation of 15 require conversion to a percentile rank so that

we can determine the actual degree of limitation reflected by the IQ scores."

Listing 12.00(D)(6)(c). The ALJ performed no conversion. The ALJ then went

beyond Baskin's findings in throwing out even the verbal score and then

endorsing scores that no expert addressed. All of this occurred with no

explanation, but an explanation will be necessary. *Cf. Howard v. Astrue*, No.

5:11–CV–01397 (TJM/DEP), 2013 WL 1294314, at *10 (N.D.N.Y. Jan. 22, 2013)

(Report and Recommendation) ("It was the ALJ's obligation, however, to

acknowledge the 2005 IQ scores as current, pursuant to the Commissioner's

regulations, and to articulate his reasons for rejecting those scores in order to

provide a basis for meaningful review of his determination.  The failure to do so is

potentially significant.  As was previously noted, it appears that, if the 2005 IQ

test results control, plaintiff may well have met his burden of proving the second

requirement in Listing § 12.05(C)."), *adopted at* 2013 WL 1289518 (Mar. 25,

2013); *Carrube v. Astrue*, No. 3:08–CV–0830 (FJS), 2009 WL 6527504, at *5

(N.D.N.Y. Dec. 2, 2009) (Report and Recommendation) ("The ALJ's failure to

clearly articulate his reasoning with respect to the IQ scores frustrates this Court's

ability to determine whether the substantial evidence supports the decision.")

(citation omitted), *adopted at* 2010 WL 2178499 (May 28, 2010).

In finding that a psychiatric review under Listing 12.05 is necessary, the

Court emphasizes that it takes no position at this time as to what the outcome of

the review should be.  The Court also takes no position as to whether new testing

should occur.  The Court's finding is limited to addressing the absence of any

analysis under Listing 12.05 that would match the analysis that the ALJ

performed for Listings 12.02, 12.06, and 12.08.  The Court will leave for

Rembert's counsel and the Commissioner to decide in the first instance how to

handle the arguments about the chronological limitations of the Tzetzo and

Andrews psychiatric reviews.  The record is not clear whether Rembert ever

made those arguments at the agency level.

## IV.   CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends granting Rembert's motion (Dkt. No. 16) in part, for the limited purpose of vacating the Commissioner's determination and remanding the case for a full assessment of intellectual disability under Listing 12.05.  The Court recommends denying Rembert's motion without prejudice to the extent that it seeks any other relief.  The Court further recommends denying the Commissioner's motion (Dkt. No. 11).

## V.   OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below.  Any objections to this Report and Recommendation must be electronically filed with the Clerk of the Court within 14 days.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.  "As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point."  *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted).

SO ORDERED.

_____/s/ Hugh B. Scott_____

HONORABLE HUGH B. SCOTT
UNITED STATES MAGISTRATE JUDGE

DATED: March 11, 2014